**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ERIC WHEELER, # 217-954 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v | * | Civil Action No.  RDB-14-2727 |
| | * | |
| R. FRITZ, Lieutenant, et al. | * | |
| | * | |
| Defendants. | * | |
| | *** | |

**MEMORANDUM OPINION**

Pending is self-represented plaintiff, Eric Wheeler's ("Wheeler") Complaint filed pursuant to 42 U.S.C. § 1983, raising claims against Defendants in their official and individual capacities for use of excessive force and unconstitutional conditions of confinement. (ECF 1). Defendants Lieutenant R. Fritz and former Warden Bobby Shearin,[1] have filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment supported by verified exhibits, declarations, and video evidence, which they later supplemented. (ECF 12, 14).  Wheeler has filed a Reply in opposition. (ECF 18).

After reviewing the pleadings, exhibits, and applicable law, this Court finds a hearing is unnecessary, *see* Local Rule 105.6 (D. Md. 2014), and the matter is ripe for disposition. For

---

[1] Service has not been obtained on behalf of Lieutenant Dale Smith.  Wheeler's only specific allegation against Smith is that he "lied" to Lieutenant Fritz that Wheeler was disruptive and refused to exit his cell. (ECF 1, p. 3). Wheeler does not identify a constitutional right or federal law abridged by such action, nor is one apparent from the record.  As will be discussed herein, the record shows that Wheeler was identified as possessing weapons and refused to exit his cell on the date of the incident. (ECF 18-3, 4).  Smith recorded the extraction team operation on April 24, 2011. (ECF 12-6; 12-4, 24).

reasons to follow, Defendants' dispositive Motion, treated as a Motion for Summary Judgment,[2] will be GRANTED.  Judgment shall be ENTERED in favor of Defendants and against Plaintiff.

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).

### I.    PLAINTIFF'S CLAIMS

Wheeler is a Division of Correction (DOC) inmate presently housed at the North Branch Correctional Institution (NBCI).  He complains that Defendants violated his rights under the Eighth Amendment, Fourteenth Amendment, Due Process Clause,[3] state laws, and DOC[4] regulations during a use of force incident at NBCI on April 24, 2011.

Wheeler claims Lieutenant Fritz ("Fritz") and former Warden Shearin ("Shearin") assembled an extraction team that used excessive force resulting in the use of pepper spray against him based on Sergeant Smith's ("Smith") "lie" that Wheeler was disruptive and refused a

---

[2]   Defendants' dispositive submission will be treated as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

[3]   Wheeler does not specify what claims are brought pursuant to the Fourteenth Amendment. At the time the use of force incident took place, he was serving a sentence pursuant to a judgment of conviction.  He was not a pre-trial detainee so that claims of excessive force would properly be brought pursuant to the Fourteenth Amendment. *See e.g. Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir.1992); *see also Riley v. Dorton*, 115 F.3d 1159, 1167 (4th Cir.1997).

[4]   Wheeler does not particularize what state laws or Department of Correction rules were allegedly violated. As no violation of federal or constitutional law is shown, there is no basis for this Court to exercise jurisdiction over Wheeler's state law claims, were any presented. *See* 28 U.S.C. § 1367(a). To the extent Wheeler is claiming that written directives or procedures were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest. Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).  A failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).

direct order to be placed in handcuffs. (ECF 1, p. 3). Wheeler complains his face was burning and he was not allowed to wash his face until he reached the isolation cell. (ECF 1, p. 4; ECF 18, p. 29).

Additionally, Wheeler complains about the conditions his confinement. He alleges that after the incident he was taken to an isolation cell where he had to wash with filthy water off the floor to rinse off pepper spray, the cell was "vermin smeared," the toilet and sink in the cell were broken, and the cell lacked furniture, electricity, or a working window. *Id.* at 4. Wheeler also claims he was left naked in this cell for 17 days without mail delivery, showers, or recreation time. He alleges Defendants threw bagged meals into the cell, and the bags spilled his food on the floor. Wheeler characterizes the meals as "inconsumable." *Id.* As redress, Wheeler requests a preliminary injunction,[5] declaratory and monetary relief. *Id.* at 10.

Wheeler has filed an affidavit with his Reply, attesting that on April 24, 2011, he had been "going through some sort of mental depression." (ECF 18, p. 5). Wheeler explains that for several days prior to the incident he had not been eating, had been "hearing things," and was feeling paranoid. *Id.* Wheeler acknowledges wearing two hats, a jumpsuit, a towel wrapped around his neck, two tee-shirts, long john bottoms, a pair of homemade shorts, and a back brace stuffed with magazines when he spoke to Smith. *Id.* Wheeler also acknowledges that his cellmate had informed Smith that he [the cellmate] was afraid for his safety and that Wheeler needed to be seen by a mental health provider. *Id.*

---

[5] Wheeler seeks preliminary injunctive relief to restrain Defendants from withholding his mail and using "chemical agents" in non-confrontational circumstances. (ECF 1, pp . 10-11). He does not satisfy the criteria for preliminary injunctive relief, *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 19 (2008) (requiring the claimant to show the likelihood on the merits, the likelihood of suffering irreparable harm absent preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest). Accordingly, issuance of a preliminary injunction is unwarranted.

Wheeler further attests he was afraid to cuff up when twice ordered by Smith to do so. "But I did not comply. I could not get myself to come to the slot and put my hands out to be cuffed. I kept telling Sgt. Smith[6] people were trying to kill me." *Id.* at 6.[7]

Wheeler also attests that he was provided a mattress on the fourth or fifth day of his confinement in the temporary cell and given a jump suit once the officers realized he did not have any clothes. *Id.* at 8. Wheeler avers he remained in the cell for seventeen days, after which he was moved to a mental health unit until November 5, 2011. *Id.*

## II.   DEFENDANTS' RESPONSE AND EXHIBITS

Defendants' exhibits include a recording of the extraction team's operation on April 24, 2011,[8] affidavits, and verified exhibits, including the investigation report issued after the use of force incident and Wheeler's medical report from April 24, 2011.

### A. AFFIDAVITS

Defendant Fritz, John White, Litigation Coordinator for NBCI, Lt. Jason Harbaugh, a correctional staff member at NBCI, and Edward Twigg, NBCI Maintenance Officer, provide the following information in the declarations.

On April 24, 2011, at approximately 12:30 p.m., Fritz was notified by Sgt. Smith that Wheeler was in possession of two weapons. (ECF 12-3). Smith explained that Wheeler's

---

[6] Smith appears to have been promoted to Lieutenant after holding the rank of Sergeant. Wheeler lists him in the Complaint as "Lt. Dale Smith, former Sergeant." (ECF 1).

[7] Wheeler has also filed affidavits of three fellow inmates, none of which is relevant to disposition of the issues presented. In particular, none of the affiants attests to having personal knowledge of the facts of Wheeler's confinement in 2011. For example, inmate Lawrence Mosely states "the normal procedure" is to strip inmates of their clothing when they are placed in isolation cells for conduct reasons. "In most cases's [sic] if the inmate has an acquaintance on the tier his acquaintance will provide him with a t-shirt, boxers, wash cloth, and socks until staff decides to bring the inmate some clothing, which is normally a jumpsuit. (ECF 18-1, p. 18). Inmate Thomas Wayne Jones attests to conditions when he was placed on administrative segregation in an isolation cell on December 3 2013. (ECF 18-1, p. 25). Inmate Andrew Dicks describes in his declaration general observations about what takes place during a cell search. (ECF 18-1, p. 44).

[8] Wheeler viewed the recording on December 8, 2014. (ECF 14-1, ECF 18-1, pp. 46-49).

4

cellmate James Jackson was also in the cell. Fritz went to Wheeler's cell and directed him to put on handcuffs. After Wheeler refused, Fritz ordered him again to apply handcuffs and warned forced would be used to gain compliance if necessary. Wheeler answered, "Your're going to have to mace me, cause I ain't cuffing up!" *Id.* Fritz attests that Wheeler had "weapons" tied to the middle of each palm of his hand. *Id.* The weapons were made of broken pieces of pens and a fingernail clipper. *Id. see also* ECF 12-4, p. 244.

Wheeler continued to refuse orders after he was "given numerous verbal commands to comply with the application of hand restraints." (ECF 12-3). A short burst of pepper spray was administered through the security slot of the cell door. Wheeler grabbed the pepper spray applicator, and it was removed from the slot. Another short burst of pepper spray Was inserted through the bottom of the cell door. Wheeler then allowed the hand restraints to be affixed.

Wheeler was escorted to the Medical Exam Room without further incident where he was examined by Steve Bray, R.N. Wheeler's cellmate Jackson, who was brought separately to the medical unit for evaluation, stated that he had been assaulted by Wheeler. Jackson sustained several puncture wounds and scratches. *Id., see also* ECF 12-4, pp. 46-48.

After medical evaluation, Wheeler was escorted to a temporary cell for a strip search before he was escorted to the shower area for decontamination. While being escorted out of the medical department, Wheeler spit at the officers numerous times. The officers pushed Wheeler's head down and lifted his arms up to prevent him from spitting on the escorting officers. Wheeler was placed in temporary cell 1-C-30 and his cellmate was placed in temporary cell 1-B-31.[9] Wheeler was then escorted to a shower areas for decontamination. (ECF 12-3).

---

[9] The cellmate, James Jackson, was not charged with any prison rule violations in regard to this incident. (ECF 12-4, p. 5).

Fritz attests NBCI's temporary cells are located on the same tiers as other inmates on Housing Unit 1. The temporary cells are empty cells where inmates can be moved for various reasons including, behavioral issues or if their regular cell is out of service for maintenance issues. In this case, Inmate Wheeler was moved to a temporary cell due to his non-compliance that led to the use of force. *Id.*

Fritz also states that "[a]t no time did I or any other correctional officer in my presence place Eric Wheeler in an 'isolation' cell." *Id.* Fritz explains that if an inmate in a temporary cell is non-compliant, he will not be let out of the cell for a shower or out-of-cell activities. Further, inmates in temporary cell housing are served bagged meals due to security concerns surrounding meals on a tray. Mail is not withheld from an inmate in a temporary cell. *Id.*

Further, Fritz attests that at no time did he or to the best of his knowledge did any other correctional officer in his presence: 1) assault Wheeler; 2) deny, interfere or delay his medical treatment; 3) place him in a cell that was 'vermin smeared"; 4) place him in a cell that had standing water on the floor and a broken toilet and sink; 5) deny him mail for 17 days in a temporary cell; 6) throw bagged meals on the cell floor; or 7) leave Wheeler naked in a temporary cell for 17 days. *Id.*

As the Litigation Coordinator at NBCI, John White attests facility policy provides that temporary cells are cleaned after they are occupied by an inmate. "Any unsanitary conditions in that cell would have been created by the inmate while he was placed in the cell." White confirms an inmate in a temporary cell is served bagged meals due to security concerns about tray meals. He states that cell windows are generally bolted shut from October 1 to April 1. (ECF 12-6).

Lt. Harbaugh is an intelligence officer at NBCI.[10] He attests that after Wheeler was strip searched, his clothing was removed from the temporary cell because Wheeler had "modified these items into body armor in addition to having weapons strapped to his hands." (ECF 12-9). Once the search was complete and the contraband removed from Wheeler and the cell, Lieutenant Fritz ordered that Wheeler be provided clothing, hygiene items, a mattress, and bedding.  There was a working sink and toilet in the cell. The heat in the cell was fully operational and could not be turned off individually.  The window was secured along with the remainder of other windows in the unit to conserve energy during winter months and mail was delivered.  Harbaugh states, "[a]t  no time did I, or any other correctional officers in my presence, placed Eric Wheeler in a cell that was "vermin smeared," had standing water on the floor, a broken toilet or broken sink." *Id.*

Edward Twigg, NBCI Acting Maintenance Officer Manager, states in his declaration that requests for cell repairs, including maintenance of toilets and sinks are submitted to the maintenance department by NCBI staff.  The maintenance department keeps a log of all repair requests. Twigg  attests no work orders were generated for HU # 1 C30 for April or May of 2011," the cell where Wheeler was held. (ECF 12-10).

## B. PRISON RECORDS

The Internal Investigation Unit ("IIU") of the Department of Public Safety and Correctional Services investigated the April 24, 2011, use of force incident.  The report indicated that James Jackson, Wheeler's cellmate, told the investigator that he did not want to file criminal charges against Wheeler. Jackson stated Wheeler had been suffering from some mental issues and he [Jackson] was trying to get Wheeler help when the incident occurred. (ECF 12-4, p. 5). Jackson said he sustained a scratch on his stomach. *Id.*

---

[10]  The record reflects Wheeler is a member of a Security Threat Group, the Black Guerilla Family. (ECF 12-6;

The Allegany County Deputy States Attorney informed the IIU investor that charges would not be filed against Wheeler because the victim [Jackson] refused to testify against Wheeler and the statute of limitations had run out on any misdemeanors in reference to the incident. Additionallly, Wheeler is serving a 123 year sentence for robbery with a deadly weapon, possession of a handgun in the use of a crime and assault. *Id.* at 7.

Steven Bray, R.N. recorded his findings after he evaluated Wheeler for pepper spray exposure on April 24, 2011. The medical report reads that Wheeler was alert and oriented, his speech was clear, his lungs were clear, and no respiratory distress was noted. (ECF 12-7). Wheeler's vital signs were stable and he denied pain or injury. *Id.*

After the incident, Wheeler was served notice of an inmate rule violation and disciplinary hearing. Wheeler refused to attend the disciplinary hearing and he was deemed by the hearing officer to have waived his appearance. (ECF 12-9). The hearing officer found Wheeler guilty of interfering with the performance of an officer's duties by not adhering to be cuffed when ordered, a violation of Rules 312 and 400. Wheeler was sanctioned with 120 days of segregation. *Id.*

### C. EXTRACTION TEAM RECORDING

The recording of the April 24, 2011 incident, corroborates Defendants' account. The recording begins with Lt. Fritz standing by the cell door and ordering Wheeler at least seven times to open the slot and put on handcuffs. (ECF 12-5). Fritz warned Wheeler that force had been authorized if he failed to comply. Fritz told Wheeler that nobody wanted to hurt him.

The cell door slot did not open or was stuck. Fritz then ordered James Jackson, Wheeler's cellmate to open the slot, and it opened immediately. Once the slot was opened, Fritz again ordered Wheeler to put on handcuffs. After Wheeler failed to comply, the order to put on

8

handcuff was repeated four more times. A voice in the cell, presumably Wheeler's, answered, "if you are going to mace me, you are going to mace me." *Id.*

Fritz proceeded to spray into the slot. The spray can applicator then appears to be pulled on from inside the cell door. Fritz then pulled back the applicator, and sprayed under the cell door. Both administrations were quick. Approximately three minutes later, Wheeler presented his hands through the slot and he was restrained in handcuffs.

The cell door was opened and Wheeler was immediately escorted to the medical unit. His vital signs were taken and he asked to wash his face. He was told he had to wait to wash his face. Wheeler spit three times during the escort from his cell to the medical unit and was warned twice to stop. As Wheeler was about a spit a fourth time upon leaving the medical unit, the officers pushed Wheeler's head down and raised his arms up. Moments later, Wheeler arrived at the temporary cell[11] where he was released from this position.

Wheeler was strip searched in the cell. Magazines and papers are visible as Wheeler's clothing was removed. *Id.* If there was standing water in the cell and smears of vermin on the wall, they are not apparent from the views of the cell floor and walls on the recording. Approximately sixteen minutes elapsed between the time Fritz first ordered Wheeler to put on handcuffs and completion of the strip search.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the

---

[11] On the recording, Fritz refers to the cell as a "contingency cell." (ECF 12-5).

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citations omitted).

## DISCUSSION

Defendants seek judgment in their favor on several grounds. They assert Wheeler's claims are barred by the statute of limitations, failure to exhaust administrative remedies, Eleventh Amendment immunity, respondeat superior, qualified immunity and failure to show an abridgement of constitutional dimension.

### 1. STATUTE OF LIMITATIONS

The state statute of limitations applied in actions brought under 42 U.S.C. § 1983 is the

statute of limitations for personal injury torts. *Wilson v. Garcia*, 471 U.S. 261, 266-69 (1985); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999). In Maryland, the general three-year statute of limitations applies to these causes of action. Md. Code Ann., Cts. & Jud. Proc. § 5-101; *see also Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995). Federal law, however, governs the question of when a cause of action accrues under 42 U.S.C. § 1983. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). Generally speaking, the running of the statute of limitations begins when a plaintiff knows or has reason to know of his injury. *Id.*

Wheeler filed this § 1983 action on August 21, 2014. It therefore follows that any claim for an injury sustained before August 21, 2011, would be time-barred because Wheeler's claims began to accrue on April 24, 2011, when the alleged wrongful action, utilizing excessive force to extract Wheeler from his cell occurred. *See Wallace v. Kato*, 549 U.S. at 388-89. Thus, a claim brought by Wheeler for alleged injuries sustained prior to August 21, 2011, is barred by the statute of limitations. Wheeler, however, blames delay in filing his federal complaint to the lengthy Administrative Remedy Procedure ("ARP") process required of him to exhaust his remedies before he could present his claims in federal court. Specifically, he claims he had difficulty accessing that process while confined in disciplinary segregation housing and corrections officials did not respond to his ARP requests. (ECF 18, pp. 21-22, 24). For reasons to follow, even if Wheeler's claims were timely filed, they are unavailing.

## 2. RESPONDEAT SUPERIOR

In order for liability to exist under § 1983, there must be personal involvement by the Defendant in the alleged violation. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode*, 423 U.S. 362, 370-71

(1976). Vicarious liability based on respondeat superior is generally inapplicable to § 1983 actions.

Wheeler acknowledges that Shearin did not personally participate in the cell extraction. (ECF 18, p. 25). Instead, Wheeler avers "the warden has failed in his duty to properly supervise his officers and regularly inspect video recordings as well as written reports to ensure that human decency was being maintained." *Id*; *see also* ECF 1, p. 6.

In order to establish a claim for supervisory liability under § 1983, a claim must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw*, 13 F.3d at 799. Wheeler's generally stated claim of administrative responsibility is insufficient to confer supervisory culpability, and Warden Shearin is entitled dismissal as a party to this proceeding.

### 3.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants next assert this case is subject to dismissal due to failure to exhaust administrative remedies. (ECF 19). The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, *et. seq.*, provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

Wheeler is subject to the strict requirements pertaining to exhaustion of remedies. The PLRA's exhaustion requirement "has been interpreted to require prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process." *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003), aff'd, 98 F. App'x 253 (4th Cir. 2004). If the appeal is unsuccessful, the prisoner must, within thirty days, file an appeal with the Executive Director of the Inmate Grievance Office ("IGO"). *Id.* Of import here, "failure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock*, 549 U.S. 199, 216, (2007). A claim that has not been exhausted may not be considered by this court. *Id.* at 220.

The exhaustion requirement "require[s] prisoners to pursue administrative grievances until they receive a final denial of their claims, appealing through all available stages in the administrative process." *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D.Md. 2003). It does not, however, require the exhaustion of administrative processes unavailable to a prisoner. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Blake v. Ross*, 787 F.3d 693 (4th Cir. 2015) (quoting *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008)).

Administrative remedies must be available to the prisoner. This court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar–Avellaveda v. Terrell,* 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A] n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See id.* 478 F.3d at 1225; *Kaba v. Stepp,* 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo,* 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in

federal court, a prisoner must have utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F.3d at 725 (4th Cir. 2008).

Defendants have filed a declaration executed by the Sean McKenzie, Administrative Remedy Procedure ("ARP") Coordinator at NBCI, stating that there is no record of an ARP filed by Wheeler related to the April 24, 2011, incident, his medical care immediately after, or after his subsequent conditions of confinement. (ECF 12-13). Scott Oakley, Executive Director of the Inmate Grievance Office ("IGO") attests in his declaration that April 21, 2014, Wheeler appealed from the disposition of an un-numbered ARP complaint with the Inmate Grievance Office (IGO) in which he complained that in April of 2011, he was improperly placed in a "contingency cell" for more than 24 hours following an incident in which he was "extracted" from his cell. *Id.*, Declaration of Scott Oakley, ¶3(b). The grievance was administratively dismissed on June 17, 2014, based on failure to properly exhaust the ARP process. *Id.* (ECF 12-14).

Wheeler maintains that he has exhausted his administrative remedies. (ECF 18, p. 25). He explains that he attempted to present his concerns through the Administrative Remedy Procedure process even while in disciplinary segregation housing. He claims it was difficult to "get staff to even stop at his door." (ECF 18, p. 24). Wheeler filed an Administrative Remedy Procedure request on March 20, 2014, complaining that he received no response to his ARP's. (ECF 18-1, p. 40; ECF 5, p. 1). He claims when he was able to file an ARP request, he received no response. (ECF 18, pp. 21-22). To the extent Wheeler argues his attempts to access the ARP

process were hindered or improperly processed so that the procedure was unavailable to him, dismissal based on his failure to exhaust administrative remedies is not appropriate.

### 4. ELEVENTH AMENDMENT IMMUNITY

Wheeler brings his claims against the Defendants in their official and personal capacities. The Eleventh Amendment bars suit in federal court, absent consent, against a state by its own citizens. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001). Under the Eleventh Amendment to the United States Constitution, a state, or one of its agencies or departments, is immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Ann. Code, State Gov't. Art., § 12–201(a) (2014 West), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Thus, Wheeler's request for monetary damages against Defendants in their official capacities is barred by Eleventh Amendment immunity. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Accordingly, Wheeler's claims against Defendants in their officials capacities are barred and subject to dismissal.

### 5. EIGHTH AMENDMENT CLAIMS

#### A. EXCESSIVE FORCE

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per

curiam); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The use of force by a prison official violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'" *Wilkins*, 559 U.S. at 38 (citation omitted).

Eighth Amendment analysis focuses on whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. This court must consider multiple factors, such as the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U. S. at 321.

Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In a claim for excessive application of force, a claimant has the burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

Notably, "'not every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment. *Wilkins*, 559 U.S. at 37 (citation omitted). Conversely, the absence of "significant" injury is not dispositive of a claim of excessive force. *Id.* at 36-37. Moreover, if force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] had the good fortune to escape without serious injury." *Id.* at 37. Put another way, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment. *Id.* at 38-40. But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation. In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

Prison officials are charged with balancing competing governmental interests, such as the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 321. When force is needed to keep order, correctional officers may have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6. Thus, in excessive force cases, the subjective component is measured by the same standard as the

objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

"'It is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted). However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment. *Williams*, 77 F.3d at 763.

There are three general categories in which courts have held that use of pepper spray or other chemical agents may constitute excessive force. *See Wagner v. Warden*, 2015 WL 1276748, *34 (D. Md. March 19, 2015). Eighth Amendment violations have found when an officer used far more than a reasonable quantity of a chemical agent. *See, e.g., Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and another officer joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Second, violations have been found when a chemical agent was used without a prior verbal order, or after a prisoner had been subdued or had become compliant. *See Tedder v. Johnson*, 527 F. App'x 269 (4th Cir. 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d. 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray without

prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence inmate did not intentionally disobey officer and was sprayed without warning).

Courts have also held the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention. *See, e.g., Walker v. Bowersox*, 526 F.3d. 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); *Norton v. City of Marietta*, 432 F.3d 1145, 1153-54 (10th Cir. 2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if "'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The United State Court of Appeals for the Fourth Circuit's 2008 decision in *Iko v. Shreve, supra*, 535 F.3d 225, involving use of pepper spray in extracting an inmate from his cell, encompasses discussion of all three categories. In *Iko*, the Court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'" *Id.* at 239. Nevertheless, the Court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," *id.* at 239-40; the

inmate was "docile and passive throughout the cell extraction," *id.* at 239; the officer's "final burst of pepper spray was deployed after [the inmate] had lain down on the floor of his cell," *id.* at 240 (emphasis in original); and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never changed [the inmate's] clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure." *Id.*

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D.W. Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown). Use of chemical agents is reasonable when a prisoner attempts to escape or evade an officer's control. *See Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). Use may be also reasonable when an officer is attempting to maintain order and discipline in the institution. *Santiago v. Walls*, 599 F.3d. 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d. 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Against this background, the following facts are not in dispute. On April 24, 2011, Officer Fritz ordered Wheeler to put on handcuffs and exit his cell. Prior to this, Wheeler's cell mate James Jackson had expressed concern about his own safety and Jackson's mental status. Officer Fritz observed Wheeler was dressed in multiple layers of clothes which appeared as

homemade body armor and there were "weapons" tied to the middle of each palm of his hand made of broken pieces of pens and a fingernail clipper.

Wheeler does not contest, and the video evidence amply demonstrates, that he repeatedly refused Lt. Fritz's numerous direct lawful orders to come to the cell door slot and put on handcuffs. Lt. Fritz cautioned Wheeler that use of force had been authorized if he did not comply. As in *Iko*, because the inmate "did not initially comply with orders to "cuff up," 535 F.3d at 239, a measured use pepper spray was warranted to remove Wheeler safely from his cell. A short burst of pepper spray was administered through Wheeler's cell door slot. A second burst of spray was administered under the cell door after Wheeler attempted to grab the spray applicator through the slot door. The video evidence shows officers then waited for approximately three minutes until Wheeler came to the cell door slot and was placed in handcuffs without further incident. Wheeler exited the cell and was immediately escorted for medical evaluation. In short, the measured force used was reasonable after multiple verbal commands were ignored, in a good faith effort to maintain prison security.

After exiting his cell, Wheeler spit several times and was warned by officers to stop. He was taken to the medical unit where his vital signs were evaluated. When Wheeler asked to wash his face, he was told by officers that he had to wait. As Wheeler was about to spit a fourth time, officers pushed his head down and raised his hands above his head so that he would not spit again. Wheeler walked with the officers in this position for several seconds from the medical unit to the temporary cell where he released from this posture. To the extent Wheeler claims this action amounted to use of excessive force, he had been warned to cease spitting, the action used, raising Wheeler's hands and pushing his head down was brief, lasting only seconds from the time he walked from the medical unit to the cell, and was reasonably calculated to protect

officers and inmates from diseases spread by sputum.   Most notably, Wheeler fails to demonstrate suffering any resulting physical injury from the escort method. In the context of Eighth Amendment analysis, Wheeler's claim does not support a claim of constitutional abridgement.

Even when considering the facts and all reasonable inferences in the light most favorable to Wheeler, this Court finds there is no genuine issue of material fact as to Wheeler's claims of excessive force, and Defendants are entitled to summary judgment in their favor as a matter of law.

### B. MEDICAL CARE

In order to state a constitutional claim under the Eighth Amendment for lack of proper medical care, a prisoner must show the actions or inactions of prison authorities showed "deliberate indifference" to "serious medical need." *Estelle v. Gamble*, 429 U.S. 97 (1976).  In so far as Wheeler claims he was provided inadequate care after exposure to pepper spray, the record clearly shows he was taken to the medical unit immediately after exiting his cell and examined by a nurse.

As nonmedical corrections staff, Defendants were entitled to rely on the medical judgment and expertise of the prison medical provider concerning the necessary course of treatment for Wheeler. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel).   Further, there is no evidence that Defendants interfered with Wheeler's medical treatment.  Although Wheeler's request to wash his face was not immediately granted, he was

22

provided an opportunity to wash soon after he was searched and secured in the temporary cell. The video evidence shows that he was able to talk and walk without assistance after exposure to pepper spray and there has been no showing of actual physical injury from the brief delay.

Under these circumstances, the undisputed evidence does not show Defendants acted with requisite deliberate indifference his serious medical need.   Absent a genuine issue of material fact, Defendants are entitled to judgment in their favor as a matter of law.

### C. CONDITIONS OF CONFINEMENT

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *see also Makdessi v. Fields*, _ F.3d __, __, 2015 WL 1062747, at *5 (4th Cir. Mar. 12, 2015) (observing the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely "restrictive or even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements-that the deprivation of [a] basic human need was objectively sufficiently serious, and that subjectively the officials acted with a sufficiently culpable state of mind. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.' "*Iko*, 535 F.3d at  238.   Only extreme deprivations can be characterized as punishment prohibited by the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8–9, (1992).   An

23

extreme deprivation is one "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

A conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

Wheeler claims that he was placed in a cell without running water so that he was able to rinse his face to ease the burning sensation caused by the pepper spray. He avers the his bagged meals were thrown on the floor or "inconsumable" (ECF 1). Wheeler's claim that he was left in the cell naked for seventeen days is directly contradicted by his own declaration in which he attests he was provided a mattress on the fourth or fifth day of his confinement and given a jump suit once the officers realized he did not have any clothes. ECF 18, p. 5. Defendants' exhibits indicate that temporary cells are cleaned after use by a prisoner, maintenance issues are registered and addressed, and bagged lunches are provided to inmates in temporary cells due to security concerns. No reports were made of maintenance problems in the temporary cell occupied by Wheeler. Lieutenant Fritz attests Wheeler was provided a shower for decontamination.

Wheeler's assignment to a temporary cell was limited in duration to seventeen days. Wheeler acknowledges he was able to wash upon reaching the temporary cell, albeit with water

24

from the floor and provided meals, although not to his liking. Further, he acknowledges that he received a mattress, and once the officers realized he was without clothes, he was provided a jump suit. Most importantly, Wheeler does not identify suffering any serious or significant physical or emotional injury resulting from the challenged conditions. Under these circumstances, there is no genuine issue of material fact as to whether Defendants acted with requisite intent to deprive Wheeler of the minimal civilized measure of life's necessities. Accordingly, Defendants are entitled to summary judgment as a matter of law.

### 6. DUE PROCESS

Prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484; (1995); *Wilkinson v. Austin*, 545 U.S. 209 (2005). Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily ... fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502, 503 (4th Cir. 1997); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ( "There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors ... requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). "[Harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto v. Clarke*, 780 F.3d 245, 249 (4th Cir. 2015). Rather, inmates must first establish that an interest in avoiding onerous or restrictive confinement conditions "arise[s] from state policies or regulations" (e.g., a regulation mandating periodic review). *Id.*

Recently, in *Incumaa v. Stirling*, _ F.3d _, 2015 WL 3973822 (July 1, 2015), the United

States Court of Appeals for the Fourth Circuit applied the general prison population as a comparable baseline for atypicality where the plaintiff was sentenced to the general prison population and had been transferred to security detention while serving his sentence. *Incumaa*, 2015 WL 3973822 * 9, quoting *Prieto*, 780 F.3d at 252 ('[a]lthough the general prison population is not the relevant atypicality baseline in all cases, it is the touchstone in cases where the inmate asserting a liberty interest was sentenced to confinement in the general population and later transferred to security detention). In Wheeler's case, he was placed in a temporary cell for seventeen days for behavioral reasons. He acknowledges receiving clothing and bedding while in the cell. Not only are these concerns largely controverted by declarations filed by Defendants, but Wheeler's allegations fail to suggest circumstances so different than those in the general prison population that they are atypical in comparison.[12] Thus, this Court concludes that even when Wheelers allegations are reviewed in the light most favorable to him, there are no genuine issues of fact, entitling Defendants to summary judgment in their favor as a matter of law.[13]

## CONCLUSION

For these reasons, the Court will GRANT Defendants' Motion for Summary Judgment by separate Order to follow.

July 17, 2015

Date

R.D. Bennett

RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

---

[12]  This Court takes notice that complaints about lack of recreation, showers, mail delivery, and meal quality are often raised by self-represented inmates in the general prison population of various correctional institutions.

[13]  This Court need not reach Defendants' defense of qualified immunity for reasons apparent herein.